IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ROB PENDERS, | § | NO. 1:22-CV-178-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| SAINT EDWARD'S UNIVERSITY, | § | |
| INC., | § | |
| | § | |
| Defendant. | § | |
| _____ | § | |

ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT

The matter before the Court is Defendant Saint Edward's University, Inc.'s ("SEU" or "Defendant") Motion for Summary Judgment. (Dkt. # 15.) The Court finds this matter suitable for disposition without a hearing. After careful consideration of the memoranda filed in support of and in opposition to the motion, the Court, for the following reasons, **GRANTS IN PART** and **DENIES IN PART** the motion.

BACKGROUND

This is an employment-discrimination action arising from SEU's termination of Plaintiff Rob Penders ("Penders" or "Plaintiff"). Penders is a white male who formerly worked as the head baseball coach of SEU from the fall of

2006, until his termination on December 3, 2021.  (Dkt. # 29 at 6.)  According to

Penders, he is the winningest coach in SEU history and was a model employee of

SEU.  (Id.)

      Prior to the 2020 baseball season, Penders alleges that he recruited

Jacques Palmer, a black male, to play baseball at SEU,[1] but the 2020 season was

abruptly cancelled due to the COVID-19 pandemic.  (Dkt. # 29 at 7.)  During the

2021 season, according to Penders, Palmer went 0 for 8, but had limited playing

time, and his eligibility expired at the end of that season.  (Id.)  Palmer asked SEU

to petition the NCAA for an additional year of eligibility.  (Id. at 8.)  SEU

apparently made the decision not to do so; Penders alleges that although the

decision whether to petition the NCAA for the extra year of eligibility was not up

to him, Palmer learned he would not be eligible and decided to make a complaint

to SEU accusing Penders of racism and discrimination against Palmer as a black

male.  (Id.)

      Thereafter, SEU hired an external investigator to investigate Palmer's

allegations.  (Dkt. # 29 at 8.)  According to Penders, the investigator determined

that Penders did not engage in any racist or discriminatory acts and that he had not

violated any SEU rule or policy.  (Id. at 9.)  Despite knowing the outcome of the

---

[1] Palmer had apparently played college baseball at both Arkansas Pine Bluff and
New Mexico Junior College prior to being recruited by Penders to SEU.  (Dkt.
# 29 at 7.)

independent investigation, Penders alleges that SEU and SEU President Montserratt Fuentes ("Fuentes") worked to conceal the outcome of the investigation and intentionally misled the community in an effort "to falsely portray herself [Fuentes] as fighting . . . for 'social justice.'" (Id.)  Penders contends that SEU and Fuentes "deliberately led students, faculty and the community to conclude that Penders had engaged in racist and discriminatory acts even though an external investigator and Fuentes herself concluded precisely the opposite."  (Id.)

According to Penders, SEU had a communication plan to conceal from the community the outcome of the investigation and to deploy "optics" which would mislead students into believing Penders had been found guilty of discrimination, and that certain "consequences," including watching training videos on communicating with players and cultural awareness, had been imposed on Penders for discriminatory conduct.  (Dkt. # 29 at 19–21.)  Penders suggests SEU intentionally and dishonestly portrayed Fuentes as fighting against Penders for "social justice" to display SEU in a good light following the events of the May 25, 2020 murder of George Floyd by a police officer in Minneapolis, Minnesota, which triggered national conversations about racial violence and inequality, including in university settings such as SEU.  (Id. at 16–19.)

Subsequent to the investigation, Penders alleges that after SEU notified Palmer of the outcome of the investigation exonerating Penders, Palmer took to social media in an effort to put pressure on Fuentes to fire Penders. (Dkt. # 29 at 21–22.) On October 4, 2021, Penders asserts that Palmer and his friend posted an online petition with the headline "Remove Coach Penders of St. Edward's University for Racist Comments and Discrimination." (Id. at 22.) Penders contends that the petition inaccurately states that he was "found guilty" of several claims, including saying the "N-word" in front of the team before a practice, telling black student athletes to remove their head coverings, and telling black players about his family's racist history and being insensitive to the experiences of black people." (Id. at 22, 55.) The petition goes on to read that "[d]espite the University finding [Penders] guilty, they have chosen not to suspend or remove him from his position" and that the petition seeks to remove Penders from his position to make SEU "understand the severity of [Pender's] actions and the consequences his discrimination has on Black players." (Id. at 55.)

According to Penders, Fuentes quickly learned of the petition and the students' reactions to it and instead of telling the truth about the outcome of the investigation, Fuentes instead "chose to mislead students and faculty to further perpetuate the false narrative of a racist White employee whose racism Fuentes was pretending to have stood up to." (Dkt. # 29 at 23.) On October 5, 2021,

Fuentes sent an email to every member of the university community in direct response to the petition which states that "[a] recent and confidential athletics personnel matter necessitated a thorough and comprehensive investigation conducted by an independent firm," and that "[f]ollowing the investigation, the university has taken actions, and there have been consequences which are consistent with the university's mission and policies." (Id. at 83.) Penders contends that Fuentes's statement failed to include that the independent investigation had actually exonerated Penders. (Id. at 22–25.) Penders asserts that Fuentes intentionally declined to include this information "to leave the community with the false sense that [she] was battling against racism." (Id. at 24.) According to Penders, given that Fuentes had just started her tenure as the SEU president on July 21, 2021, or just over two months prior to the petition, Fuentes sought "to bolster her 'social justice' credentials at this early hour of her presidency" because she was the "first Hispanic president to lead St. Edward's." (Id. at 25.)

Penders alleges that Fuentes's email to the university community triggered the petition to gain over 600 signatures calling for Penders's termination, including some signatures by SEU faculty members who had no knowledge the investigation had exonerated Penders. (Dkt. # 29 at 25–26.) Additionally, Penders states that the university newspaper reported on the email Fuentes had sent out and stated that the investigation involved Penders. (Id.) Despite the article being

published in the school newspaper, Penders argues that Fuentes and SEU again declined to set the record straight that he had been cleared of any wrongdoing. (Id.) On October 13, 2021, subsequent to the article, a student-led protest and demonstration occurred on the SEU campus which called for Pender's resignation. (Id. at 27.)

Thereafter, Penders states that Melinda Terry, Associate Director of Athletics for Compliance, informed him that she had requested that Lisa Kirkpatrick, Vice President for Student Affairs, set the record straight about the outcome of the investigation, but that SEU never did. (Dkt. # 29 at 29.) On October 22, 2021, Penders alleges that a faculty senate meeting turned heated with questions concerning why Penders had not yet been terminated and again Fuentes and SEU refused to tell the truth of the investigation. (Id.) According to Penders, during this whole time, Fuentes had instructed him to say nothing about the allegations or the investigation. (Id. at 29–30.)

Subsequently, Dom Thornton, a different, former SEU baseball player came forward to accuse Penders of race discrimination for events that had happened more than three years' prior in 2018. (Dkt. # 29 at 31.) Penders alleges that Thornton played only one season at SEU and that, during a game, Penders and Thornton got into a disagreement about Thornton's swing on a pitch which ultimately resulted in Thornton quitting the team during the middle of the game.

(Id. at 31–32.)  After he failed to show up for a double header scheduled that

weekend, Thornton texted Penders, asking him if he could get back on the team.

(Id. at 32.)  Penders met with Thornton the following week to discuss it, along with

SEU assistant baseball coaches Bryan Faulds and David Wood, informing

Thornton that he would not be allowed to return to the team.  (Id.)  Penders,

however, allowed Thornton to keep his athletic scholarship.  (Id.)  According to

Penders, there was nothing about the interaction with Thornton that had to do with

his race.  (Id.)

        Penders alleges that, in October 2021, over three years later, Thornton

"sought to capitalize" on "the controversy" created by Palmer and demanded a

monetary settlement from SEU.  (Dkt. # 29 at 32–33.)  Penders states that

Thornton's lawyer notified SEU that Thornton had secretly recorded his

conversation with Penders from 2018 when Thornton had asked Penders to be

reinstated to the team, giving a copy of the tape to SEU.  (Id. at 33.)  Thereafter, on

October 18, 2021, Penders was notified by SEU that another complaint had been

filed against him for race discrimination, and that the same external investigator

would be handling the investigation of the complaint.  (Id.)

        According to Penders, following a thorough investigation, the external

investigator once again found that Penders had not engaged in racism,

discrimination, or any other violation of a university policy or rule in his dealings

with Thornton.  (Dkt. # 29 at 34.)  Penders alleges that SEU leadership, including

Fuentes, agreed with the investigator's findings exonerating Penders.  (Id.)  The

results of the investigation were communicated to Penders by SEU on November

16, 2021, and he received written confirmation on December 2, 2021, that the

"investigation did not find any support for the allegations of racial discrimination

or any violation of the University's discrimination policies."  (Id.)

Penders alleges that Fuentes was once again given an opportunity to

clear Penders's name to the SEU community, especially given that a march on the

SEU Main Building was soon planned as part of a #RobPendersResign movement.

(Dkt. # 29 at 34.)  However, Penders contends that Fuentes and SEU still refused

to communicate to anyone the results of the investigation.  (Id.)  Instead, Penders

alleges that Fuentes made the decision to terminate his employment.  (Id.)

According to Penders, Fuentes made this decision "amid escalating pressure to fire

Penders for discrimination," and her misleading the community into believing he

had engaged in discrimination.  (Id. at 34–35.)

On December 2, 2021, Penders was called into a meeting to discuss

the investigation, and was told by SEU Human Resources staff that although he

had been exonerated of all accusations of race discrimination and that he had not

violated any university policies, Fuentes had determined that Penders's

employment should be terminated.  (Dkt. # 29 at 35.)  Penders alleges that he was

8

told the reason for his termination was that "it appeared [his] behavior was not in direct alignment with the operating principles, with the values, and with the position [SEU was] taking at [that] time on any episode like this."  (Id.)  Penders states that the HR staff who informed him of this decision told him that the decision was "not made unilaterally" and that it was made above her authority level.  (Id.)  Still, Penders states that SEU told him that he would be allowed to coach the 2022 baseball season and that his termination date would not be until June 15, 2022.  (Id.)  At that time, according to Penders, he told the HR staff that he believed the termination was wrongful and he tried to get his attorney present on the phone at the meeting but could not reach him.  (Id. at 36.)  Penders states the HR staff then informed him that the meeting would not continue with Penders's lawyer present without SEU's own lawyers present at the meeting.  (Id.)

Thereafter, Penders alleges that he left the meeting with the intention of reconvening with both his lawyer and SEU's lawyers present.  (Dkt. # 29 at 36.) Despite this, Penders contends that SEU made the decision to terminate him effective immediately, thereby engaging in retaliation for his opposing his discriminatory firing.  (Id.)  On December 3, 2021, Fuentes sent another email to the SEU community informing them of Penders's termination amid "concerning information and allegations . . . that are not in alignment with our values," and that there was a need for a leadership change on the baseball team.  (Id. at 37, 91–92.)

9

Penders again alleges that Fuentes refused to tell the truth regarding the investigations.  (Id. at 37.)  Instead, Penders maintains that SEU and Fuentes "intended for the public to draw the conclusion that media [in the Austin community] did in fact draw—that Penders was found to have engaged in discriminatory conduct."  (Id. at 39.)  Penders asserts that he was fired by Fuentes in order to promote her image and commitment to "social justice" by firing a "high-profile White coach whom she falsely led the community to believe had engaged in acts of discrimination."  (Id. at 40.)

On February 28, 2022, Penders filed suit in this Court.  (Dkt. # 1.) Plaintiff's amended complaint alleges claims against SEU for race discrimination and retaliation in violation of 42 U.S.C. § 1981, as well as for libel and slander. (Dkt. # 29.)  On September 29, 2023, SEU filed a motion for summary judgment on Plaintiff's claims.  (Dkt. # 70.)  On October 13, 2023, Plaintiff filed a response in opposition (Dkt. # 71); on October 20, 2023, SEU filed a reply (Dkt. # 73).  On October 27, 2023, Plaintiff filed a motion asking the Court to allow him to file a sur-reply (Dkt. # 75), which the Court granted on February 9, 2024 (Dkt. # 78). Additionally, on October 20, 2023, SEU filed objections to Plaintiff's summary judgment evidence (Dkt. # 74), which Plaintiff opposed on October 27, 2023 (Dkt. # 76).

APPLICABLE LAW

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Vann v. City of Southaven, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); see also Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Bennett v. Hartford Ins. Co. of Midwest, 890 F.3d 597, 604 (5th Cir. 2018) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).  "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  Nola Spice Designs, LLC v. Haydel Enter., Inc., 783 F.3d 527, 536 (5th Cir. 2015) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial.'"  Kim v. Hospira, Inc., 709 F. App'x 287, 288 (5th Cir. 2018) (quoting Nola Spice Designs, 783 F.3d at 536).  While the movant must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  Austin v. Kroger Tex., L.P., 864 F.3d 326, 335 (5th Cir. 2017)

11

(quoting <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)).  A

fact is material if it "might affect the outcome of the suit."  <u>Thomas v. Tregre</u>,

913 F.3d 458, 462 (5th Cir. 2019) (citing <u>Anderson</u>, 477 U.S. at 248).

   "When the moving party has met its Rule 56(c) burden, the

nonmoving party cannot survive a summary judgment motion by resting on the

mere allegations of its pleadings."  <u>Jones v. Anderson</u>, 721 F. App'x 333, 335 (5th

Cir. 2018) (quoting <u>Duffie v. United States</u>, 600 F.3d 362, 371 (5th Cir. 2010)).

The nonmovant must identify specific evidence in the record and articulate how

that evidence supports that party's claim.  <u>Infante v. Law Office of Joseph</u>

<u>Onwuteaka, P.C.</u>, 735 F. App'x 839, 843 (5th Cir. 2018) (quoting <u>Willis v. Cleco</u>

<u>Corp.</u>, 749 F.3d 314, 317 (5th Cir. 2014)).  "This burden will not be satisfied by

'some metaphysical doubt as to the material facts, by conclusory allegations, by

unsubstantiated assertions, or by only a scintilla of evidence.'"  <u>McCarty v.</u>

<u>Hillstone Rest. Grp., Inc.</u>, 864 F.3d 354, 357 (5th Cir. 2017) (quoting <u>Boudreaux v.</u>

<u>Swift Transp. Co.</u>, 402 F.3d 536, 540 (5th Cir. 2005)).  In deciding a summary

judgment motion, the court draws all reasonable inferences in the light most

favorable to the nonmoving party.  <u>Wease v. Ocwen Loan Servicing, LLC</u>,

915 F.3d 987, 992 (5th Cir. 2019).

   Additionally, at the summary judgment stage, evidence need not be

authenticated or otherwise presented in an admissible form.  <u>See</u> Fed. R. Civ. P.

56(c); <u>Lee v. Offshore Logistical & Transp., LLC</u>, 859 F.3d 353, 355 (5th Cir. 2017).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  <u>United States v. Renda Marine, Inc.</u>, 667 F.3d 651, 655 (5th Cir. 2012) (quoting <u>Brown v. City of Houston</u>, 337 F.3d 539, 541 (5th Cir. 2003)).

ANALYSIS

SEU moves for summary judgment on all of Plaintiff's claims.  (Dkt. # 70.)  SEU argues that Plaintiff's (1) 42 U.S.C. § 1981 race discrimination claim fails because he cannot make out a prima facie case or show pretext; (2) 42 U.S.C. § 1981 retaliation claim fails because there is no evidence he engaged in a protected activity nor any evidence of causation; and (3) defamation claims fail as a matter of law.  (<u>Id.</u>)

I.    <u>42 U.S.C. § 1981</u>

Penders asserts his claims for discrimination and retaliation pursuant to 42 U.S.C. § 1981.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts."  42 U.S.C. § 1981(a).  To make out a successful claim under § 1981, "a plaintiff must initially plead and ultimately prove that, but for race, [the plaintiff] would not have suffered the loss of a legally protected right."  <u>Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media</u>, 140 S.

13

Ct. 1009, 1019 (2020); see also Hoyt v. Am. Nat'l Ins. Co., No. 3:20-CV-545-L, 2021 WL 2823449, at *5 (N.D. Tex. July 6, 2021).  Section 1981 applies in the employment context and is "a means of punishing employers who discriminate on the basis of race."  Carroll v. Gen. Accident Ins. Co. of Am., 891 F.2d 1174, 1176 (5th Cir. 1990).  Section 1981 claims can include racial discrimination, hostile work environment, and retaliation, among others.  See Ricks v. Friends of WWOZ, Inc., No. 18-CV-9767, 2019 WL 3858950, at *5 (E.D. La. Aug. 15, 2019).

A.    Discrimination

To succeed on a § 1981 discrimination claim, a plaintiff must establish: "(1) [he or she is a member] of a racial minority; (2) [d]efendant[] intended to discriminate on the basis of race; and (3) the discrimination concern[s] one or more of the activities enumerated in [§ 1981]"—here, the "enjoyment of all benefits, privileges, terms, and conditions of a contractual relationship."  Body by Cook, Inc. v. State Farm Mut. Auto. Ins., 869 F.3d 381, 386 (5th Cir. 2017) (quoting § 1981(b)).  While Penders is not a racial minority, the Supreme Court has held that § 1981 will support a claim of reverse discrimination.  Holland/Blue Streak v. Barthelemy, 849 F.2d 987, 989 (5th Cir. 1988) (citing McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 295–96 (1976)).

14

The analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims.  Jones v. Robinson Prop. Grp. L.P., 427 F.3d 987, 992 (5th Cir. 2005).  Courts employ the burden shifting analysis of McDonnell Douglas v. Green to analyze claims of intentional discrimination.  Jones v. Robinson Prop. Grp. L.P., 427 F.3d 987, 992 (5th Cir. 2005).  Under McDonnell Douglas, Plaintiff must demonstrate four elements to establish a prima facie case of intentional racial discrimination at the summary judgment phase: (1) membership in a protected class; (2) he was qualified for the position at issue; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class or was treated less favorably than others similarly-situated.  Body By Cook, 869 F.3d at 386 n.1 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973)).  "Once established, the plaintiff's prima facie case raises an inference of intentional discrimination."  LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 (5th Cir. 1996).

"If a prima facie case for discrimination can be established, then the burden shifts to the defendant to rebut the plaintiff's case by articulating a legitimate, nondiscriminatory reason for any alleged unequal treatment."  Hall v. Continental Airlines, Inc., 252 F. App'x 650, 654 (5th Cir. 2007) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253–56 (1981); Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 957 (5th Cir. 1993)).

If the employer articulates a legitimate non-discriminatory reason, the burden then shifts back to the plaintiff to demonstrate that discrimination was the but-for cause of the adverse employment action.  See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. —, 140 S. Ct. 1009, 1014–15, 206 L.Ed.2d 356 (2020).  The standard of causation for a § 1981 claim is the "traditional" "but for" causation—meaning that a plaintiff must prove that its injury would not have occurred "but for" the defendant's unlawful conduct—rather than the "motivating factor" standard that applies in Title VII employment discrimination cases.  Id. at 1013, 1017.

      1.   Prima Facie Case

SEU does not dispute that Plaintiff meets the first three elements of a prima facie case of race discrimination.  (Dkt. # 70 at 4.)  Instead, SEU argues that Plaintiff cannot satisfy the fourth element because he was replaced by another white male and was not treated less favorably than other similarly situated individuals.  (Id.)

Indeed, the evidence indicates that another white male, Bryan Faulds, replaced Penders as the SEU head baseball coach.  (Dkt. # 70-3 at 132; Dkt. # 70-8 at 5.)  Regarding whether Penders was treated less favorably than others who were similarly situated, "the Fifth Circuit defines 'similarly situated' narrowly." Agoh v. Hyatt Corp., 992 F. Supp. 2d 722, 735 (S.D. Tex. 2014) (citation omitted).

16

"Similarly situated individuals must be 'nearly identical' and must fall outside the plaintiff's protective class." Id. at 735–36 (citing Wheeler v. BL Dev. Corp., 415 F.3d 399, 405 (5th Cir. 2005)). "Where different decision makers or supervisors are involved, their decisions are rarely 'similarly situated' in relevant ways for establishing a prima facie case." Id. at 736 (citation omitted).

Here, Plaintiff argues that he and President Fuentes are similarly situated for purposes of establishing a prima facie case. (Dkt. # 71 at 6.) However, other than his own assertions that the two were treated differently by SEU when accused of racism, Plaintiff offers no evidence that the two were similarly situated. Indeed, SEU has provided its own evidence which supports the conclusion as a matter of law that Fuentes and Plaintiff held very different job responsibilities, had different supervisors, and had their employment status determined by different individuals. (See Dkt. 70-3 at 136, 138–157; Dkt. # 70-5 at 5.) Given this evidence, the Court finds the two are not similarly situated.

Nevertheless, Plaintiff argues that he need not show that he was replaced by someone outside of his protected class or that he was treated less favorably than others similarly situated. (Dkt. # 71 at 1.) Plaintiff argues that the traditional McDonnell-Douglas framework does not apply in his case, quoting the Fifth Circuit's recent unpublished decision in Paugh v. Lockheed Martin Corp., 2023 WL 417648 at *10 (5th Cir. Jan. 26, 2023), wherein the Court noted that "it

is important to recall that the <u>McDonnell Douglas</u> framework for establishing a prima facie case of discrimination 'was not intended to be an inflexible rule.'" <u>Id.</u> (quoting <u>Furnco Constr. Corp. v. Waters</u>, 438 U.S. 567, 575 (1978)).  The Fifth Circuit also stated that "[t]he facts necessarily . . . vary in Title VII cases," and the elements of the prima facie case are "not necessarily applicable in every respect to differing factual situations." <u>Id.</u> (quoting McDonnell Douglas, 411 U.S. at 802 n.13).

Additionally, Plaintiff quotes the Fifth Circuit's decision in <u>Abdallah v. Mesa Air Group, Inc.</u>, 83 F.4th 1006, 1014 (5th Cir. 2023), for the proposition that the relevant test for proving § 1981 discrimination is whether the outcome would have been different "but for" Plaintiff's protected status and not necessarily whether he was treated differently from similarly situated employees. (Dkt. # 71 at 4.)  In that case, the Fifth Circuit held that "[t]he 'simple test' for determining whether disparate treatment has occurred is "whether the evidence shows treatment of a person in a manner which but-for that person's [protected characteristic] would be different." <u>Abdallah</u>, 83 F.4th at 1014 (quoting <u>City of L.A., Dep't of Water & Power v. Manhart</u>, 435 U.S. 702, 711 (1978) (internal quotation marks and citation omitted).  "Disparate treatment for a Title VII claim 'is established whenever a particular outcome would not have happened "but for" the purported cause." <u>Id.</u>  "In other words, a but-for test directs us to change one

18

thing at a time and see if the outcome changes.  If it does, we have found a but-for cause." Id. (quoting Bostock v. Clayton County, 590 U.S. 644, 140 S. Ct. 1731, 1739, 207 L.Ed.2d 218 (2020)).

The Court disagrees with Plaintiff that this is the type of case recognized in Paugh "that does not fit the ordinary mold of employment discrimination cases," such that the traditional McDonnell Douglas framework may be modified.  Paugh, 2023 WL 417648, at *4.  For example, Paugh involved a failure to hire claim, wherein the plaintiff alleged that "unlike her male colleagues, [she] was kept in the dark about which positions [the defendant] actually intended to fill, with the result that she applied for seven positions that Lockheed Martin ultimately cancelled." Id.  The Fifth Circuit held that the plaintiff had "created a genuine issue of material fact as to whether critical hiring information was meted out discriminatorily in violation of Title VII." Id.; see also Williams v. Giant Food Inc., 370 F.3d 423, 431 (4th Cir. 2004) ("[I]f the employer fails to make its employees aware of vacancies, the application requirement may be relaxed and the employee treated as if she had actually applied for a specific position."); Mauro v. S. New England Telecomms., Inc., 208 F.3d 384, 387 (2d Cir. 2000) (holding the application requirement inapplicable when the plaintiff was "unaware of specific available positions because the employer never posted them"); E.E.O.C. v. Metal Serv. Co., 892 F.2d 341, 349 (3d Cir. 1990) ("A relaxation of the application

element of the prima facie case is especially appropriate when the hiring process itself, rather than just the decision-making behind the process, is implicated in the discrimination claim or is otherwise suspect.").  Here, Plaintiff does not challenge an alleged failure to hire or provide information about job vacancies.  Instead, Plaintiff challenges his termination from employment, upon which the Court finds no outstanding facts which warrant a departure from the traditional McDonnell Douglas framework.

Likewise, the Fifth Circuit's ruling in Abdallah did not concern employment discrimination pursuant to Title VII and therefore the Court never referenced the McDonnell Douglas framework in considering the discrimination claims brought by airline passengers of Middle Eastern descent against the airline in that case.  Abdallah, 83 F.4th at 1014.  Given this, the Court finds the facts in Abdallah distinguishable.

Finding no reason to depart from the traditional McDonnell Douglas employment discrimination framework, the Court finds that Plaintiff has failed to establish a prima facie case of § 1981 discrimination to sustain his claim.  Plaintiff has not shown he was replaced by someone outside his protected class nor that he was treated less favorably than others similarly situated.  But even if Plaintiff could establish a prima facie case, he has not shown that but for SEU's alleged discrimination, he would not have been terminated as discussed below.

20

2.     <u>Reason for Termination</u>

SEU offers the following as its legitimate nondiscriminatory reason for Plaintiff's termination: SEU "terminated [Plaintiff] because of his treatment of Dominic Thornton during a February 2018 meeting [which] did not conform with SEU's principles and values." (Dkt. # 70 at 5.) In support, SEU has provided evidence of Plaintiff's statements during that meeting, which include: (1) "So you tell me how you're going to change, because quite frankly, I'm not changing shit" (Dkt. # 70-33 at 15); (2) "[Y]ou know, you can -- you can bullshit your way through a lot of stuff. You can do that." (<u>id.</u> at 12); (3) "This isn't about me. I've won a shit pile of games here. . . . I've won a ton of championships. This program was dog shit before I got here." (<u>id.</u> at 15); (4) "I'm not trying to stroke myself off here" (<u>id.</u> at 33); and (5) "It's amazing how we won three without you, too. Very well. Shocker. And 424 other games without you." (<u>id.</u> at 47).

SEU also presents the testimony of Vice President Lisa Kirkpatrick, who stated that she made the ultimate decision to terminate Plaintiff because of his "treatment of the student at the follow-up of [Thornton's] complaint that I understood to not be how we treat students, and that in that position of power as coach and leader on campus that I had a responsibility to address that behavior and make sure it didn't happen again." (Dkt. # 70-9 at 25.) Additionally, President Fuentes and Melissa Esqueda, SEU's head of Human Resources at the time of

21

Plaintiff's termination, both confirmed Kirkpatrick's reason for terminating

Plaintiff.  (Dkts. # 70-6 at 19; Dkt. # 70-19 at 10, 13.)

Because SEU has articulated a legitimate, nondiscriminatory reason

for Plaintiff's termination, the Court will consider whether Plaintiff can show

pretext.

### 3.    Pretext

Pretext is defined as a false reason given for an adverse employment

action that hides or serves as a cover-up of the employer's true motive for the

action.  McDonnell Douglas, 411 U.S. at 805; Godfrey v. Katy Indep. Sch. Dist.,

395 F. App'x 88, 91 (5th Cir. 2010) (finding that pretext can be seen as "a coverup

for a [] discriminatory decision"); Barnes v. Bd. of Tr. of Univ. of Ill., 946 F3d

384, 389-90 (7th Cir. 2020) (describing pretext as not "just faulty reasoning or

mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony

reason for some action.'").  The issue can also be framed as "whether [the

employer's] reason, even if incorrect, was the real reason for [the plaintiff's]

termination."  Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 899 (5th Cir.

2002).  To establish pretext, Plaintiff must specifically show that SEU's "proffered

explanation is false or 'unworthy of credence.'"  Laxton v. Gap Inc., 333 F.3d 572,

579 (5th Cir. 2003).

Plaintiff argues that there is a genuine dispute of fact that but for SEU's discrimination on account of his race, SEU would not have terminated him. (Dkt. # 71 at 4.) Plaintiff's evidence consists of: (1) SEU's own internal investigation into the Thornton incident which ultimately concluded there was no racial discrimination or disparity in Penders' treatment of Thornton (Dkt. # 71-1 at ¶120; Dkt. # 70-15); (2) SEU's leadership agreed with that investigation's findings (Dkt. # 71-1 at ¶121; Dkt. # 71-2 at 6–7, 20–21); (3) SEU learned the full scope of the actions for which it ultimately fired Penders on October 18, 2021, but waited until December 2, 2021, to terminate him, which Plaintiff claims is important because of the mounting public pressure on campus to fire him in November, or just prior to the decision to terminate him in December (Dkt. # 71-1 at 47–49; Dkt. # 71-3 at 25); (4) SEU's presentation of the findings of the investigation to Penders on November 16, 2021, but they did not indicate they were planning on firing Penders at that time (Dkt. # 71-12 at ¶46); (5) SEU's indication that although it only wanted to announce Penders' termination to the public on December 3, 2021, it intended to employ him through the next baseball season which is inconsistent with its claim that Penders' actions were "not in alignment with [its] values" (Dkt. # 71-4 at 11) and instead, according to Penders "illustrates that the school's real motive was . . . to appear, amid the campus uproar over false allegations of racism by Penders, to be taking action against and imposing consequences in a fight

against racism and 'anti-Blackness'" (Dkt. # 71 at 9–10); and (6) evidence that Faulds, who replaced Penders as the next SEU head baseball coach, was also in the February 2018 meeting with Thornton, but SEU did not take any action against Faulds despite SEU's claim that Penders acted contrary to SEU's values at the meeting (Dkt. # 71-6 at 4–5). Plaintiff argues that all of this evidence demonstrates the falsity of SEU's explanation for his termination, thus raising a genuine dispute of material fact as to whether his race was the but-for cause of his termination or, in other words, whether the outcome of his termination would have been different if he was not white. (Dkt. # 71 at 10–11.)

"The ultimate determination, in every case, is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination." Crawford v. Formosa Plastics Corp., La., 234 F.3d 899, 902 (5th Cir. 2000). Thus, evidence must be of sufficient "nature, extent, and quality" to permit a jury to reasonably infer discrimination. Id. at 903. In Owens v. Circassia Pharms., Inc., the Fifth Circuit held that "employers are entitled to be unreasonable in terminating their employees so long as they do not act with discriminatory animus." 33 F.4th 814, 826 (5th Cir. 2022) (quoting Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 899 (5th Cir. 2002)) (internal quotations omitted). The question, then, is not whether the employer made a reasonable decision in terminating its employee, but rather "whether, viewing all of the

24

evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination." Owens, 33 F.4th at 826 (quoting Crawford, 234 F.3d at 902).

In Owens, an Asian woman sued her former employer alleging that she was discriminated against pursuant to Title VII and § 1981 based on her protected class. Id. at 823. The Fifth Circuit determined that Owens had not met her burden of demonstrating pretext because although she offered evidence that "tends to show that [the employer's] justification is unworthy of credence," and "sufficient evidence for a jury to disbelieve [the employer's] explanation for her termination, it was "not necessarily enough." Id. at 826. Again, the Fifth Circuit held that "[e]mployers are 'entitled to be unreasonable' in terminating their employees 'so long as they do not act with discriminatory animus.'" Id. (quoting Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 899 (5th Cir. 2002)). "Thus, it is the employee's burden to create a fact dispute as to reasonableness that could give rise to an inference of discrimination." Id. "As the Supreme Court explained in Reeves v. Sanderson Plumbing Prods., Inc., 'there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.'" Id. (citing 530 U.S. at 148).

The Fifth Circuit found that Owens' discrimination claim was one of those instances.  Id.

Here, like Owens, the Court finds that Plaintiff has provided sufficient evidence for a jury to disbelieve SEU's stated reason for his termination.  Indeed, the Court is troubled by the incidents leading up to Plaintiff's termination, including, among others, that an internal investigation of the basis for which Plaintiff was terminated—his actions during a meeting with Thornton—concluded that Penders had not engaged in any race discrimination.  And importantly, this information was never disseminated publicly or to the campus population, despite Plaintiff's evidence that growing pressure was mounting on SEU's campus to terminate Penders based on allegations of race discrimination against former baseball players, and set amongst the recent backdrop of national conversations on race in light of the murder of George Floyd.  (See Dkt. # 71-1 at 19.)  And, while it is true that Plaintiff's conduct during the meeting with Thornton was found not to "conform with SEU's principles and values," a jury could certainly infer that this reason *alone* for his termination was false or unworthy of credence.  For instance, SEU has not presented any controverting evidence that Penders had engaged in similar behavior prior to this time, nor any evidence that he was disciplined or counseled on this behavior prior to the time the decision was made to terminate him.

Nevertheless, while Plaintiff has likely presented sufficient evidence for a factfinder to reject SEU's explanation for his termination or find that it is false, he has not presented sufficient evidence that SEU's termination of him gives rise to a reasonable inference of discrimination on account of his race. See Owens, 33 F. 4th at 830. A plaintiff must "produce sufficient evidence of implausibility to permit an inference of *discrimination*, not merely an inference that [SEU's] proffered reason is false." Id. at 831 (emphasis in original). "Employment laws do not transform federal courts into human resources managers, so the inquiry is not whether [SEU] made a wise or even correct decision to [terminate Penders' employment]." Id. at 826 (citing Bryant v. Compass Grp. USA Inc., 413 F.3d 471, 478 (5th Cir. 2005)).

Thus, like Owens, the Court finds that even if Plaintiff could establish a prima facie case of discrimination and set forth sufficient evidence to reject SEU's explanation for his termination, "no rational factfinder could conclude that the action was discriminatory." Owens, 33 F. 4th at 833 (quoting Reeves, 530 U.S. at 148). In other words, a juror could reasonably conclude that SEU wanted Penders gone for some other reason than his meeting with Thornton, but an "inference of discrimination [would] be weak or nonexistent." Fisher v. Vassar Coll., 114 F.3d 1332, 1338 (2d Cir. 1997) (quoted approvingly in Reeves, 530 U.S. at 148).

Accordingly, the Court finds that summary judgment in favor of SEU is appropriate because Plaintiff's evidence is of insufficient "nature, extent, and quality" to permit a reasonable factfinder to resolve "the ultimate determination" of discrimination in his favor.  See Owens, 33 F.4th at 834 (quoting Crawford, 234 F.3d at 902–03).  "It is not enough to permit a reasonable inference that *some* reason other than the proffered one motivated the adverse action."  Id. (emphasis in original).  Instead, "[a]n aggrieved employee's evidence must, at the summary judgment stage, permit a reasonable inference that the real reason was impermissible discrimination."  Id.

B.　　Retaliation

The Court also considers "retaliation claims based on Title VII and 42 U.S.C. § 1981 under the same rubric of analysis."  Johnson v. PRIDE Indus., Inc., 7 F.4th 392, 399 (5th Cir. 2021) (internal quotation and brackets omitted). A prima facie retaliation claim "under either Title VII or § 1981 requires that a plaintiff show that: (1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action."  Id. at 407–08 (internal quotation omitted).

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to "proffer a legitimate rationale for the underlying employment action."

Davis v. Dallas Area Rapid Transit, 383 F.3d 309, 319 (5th Cir. 2004).  If the

defendant satisfies this burden, the plaintiff must offer sufficient evidence that the

proffered reason is a pretext for retaliation.  Septimus v. Univ. of Houston,

399 F.3d 601, 608 (5th Cir. 2005); Gee v. Principi, 289 F.3d 342, 345, 347 (5th

Cir. 2002).  Under this framework, the employee's ultimate burden is to prove that

the adverse employment action would not have occurred but for the protected

conduct.  Brown v. Wal-Mart Stores East, L.P., 969 F.3d 571, 577 (5th Cir. 2020).

Even if a plaintiff's protected conduct is a substantial element in a defendant's

adverse employment action, no liability for unlawful retaliation arises if the

employee would have faced that discipline even without the protected conduct.

See Long v. Eastfield Coll., 88 F.3d 300, 305 n.4 (5th Cir. 1996)

      1.    Prima Facie Case

      SEU does not dispute that Plaintiff suffered an adverse employment

action, but instead argues that Plaintiff's § 1981 retaliation claim fails because he

cannot show evidence that he engaged in a protected activity nor that there is a

causal connection between any protected activity and the adverse employment

action.  (Dkt. # 70 at 6.)

a.     Protected Activity

An employee engages in a protected activity under Section 1981 when "he has opposed any practice made unlawful by [Title VII]."  42 U.S.C. § 2000e-3(a).  In other words, to qualify as a protected activity, the employee's conduct must have "opposed" the employer's practice and that opposed practice must have been unlawful.  Importantly, a plaintiff need not demonstrate that the practice was actually unlawful for his opposition to be a protected activity; rather, it is enough that the plaintiff reasonably believed the practice was unlawful.  EEOC v. Rite Way Serv., Inc., 819 F.3d 235, 242 (5th Cir. 2016).

The Fifth Circuit has instructed that "[w]hen examining whether an employee's belief that his employer engaged in an unlawful act was reasonable, a court must ask whether a person, 'not instructed on Title VII law as a jury would be, [could] reasonably believe that []he was providing information about a Title VII violation[.]'"  Scott v. U.S. Bank Ass'n, 16 F.4th 1204 (5th Cir. 2021) (quoting EEOC v. Rite Way Serv., Inc., 819 F.3d 235, 242 (5th Cir. 2016) (citation omitted)).  "This inquiry is informed by the nature of the statement forming the base of the alleged discrimination, whether the statement was directed at a particular person or group of persons, whether it came from a person with supervisory authority, and the setting where the employee's complaint was voiced."  Id. at 243–44.

Plaintiff contends that he engaged in protected activity when he met with SEU administrators on December 2, 2021, wherein he was informed that he was being terminated effective June 15, 2022.  (Dkt. # 71 at 11.)  According to Plaintiff, he told the administrators that he was being subjected to "wrongful termination" and he tried to get his lawyer on the phone and asked for a police officer to come into the room.  (Id.)  Thereafter, Plaintiff contends that SEU made the decision to terminate his employment effective immediately.  (Id.)  Plaintiff contends that the decision to terminate him effective immediately was retaliation for his protected activity in claiming he was subject to wrongful termination on account of his race.  (Id.)  Plaintiff offers the transcript of the December 2, 2021 meeting where Penders was terminated (Dkt. # 71-10).  In relevant part, the transcript states the following:

**Melissa Esqueda:** How are you? Thank you for coming and meeting with us and thank y'all for joining us as well I wanted to make sure we were just all on the same page after this conversation. And so you and I met and I told you I would be getting back with you about the results of the investigation in a while. And so wanted to share with you that the results – I mean we put all that time and effort into the actual investigation, which you know. And so we took everything that was provided at that time to see if there was any direct violation of any type of um handbook issues or legalities things of that nature. And it was found that there was nothing to support that there was a direct violation of discrimination based on race which was the initial allegation made by Dominic. Now some other things that we have to consider along the way was um the fact that, well we have a new leader and she takes a very strong position on some things and so we just have to consider the operating principles, values and the manner in which leaders are expected to behave and treat all students. And so with that said, after a lot of thought and looking at the entire scope of the case, the decision was made – I don't unilaterally make these decisions as you know – the decision was made by the university that it appeared that your behavior is not in direct alignment with the operating principles, with the values, and with the position we are taking at this time on any episode like this. So the university is offering that next spring – I mean this spring which is the upcoming baseball season – would be your final season with St. Edward's University.

**Rob Penders:** Huh!

**Melissa Esqueda**: You would be separated from the university June 15, which is at the end of the season. And, some things –

Rob Penders: Wow, this is unbelievable. So, wait a minute. You told me a couple of weeks ago that there was nothing wrong. And now---

**Melissa Esqueda**: I'm still telling you that there was not any direct –

**Rob Penders:** But there is something wrong here. You guys are now terminating my position. This is ridiculous. And you're leaving me in a position… I, I have nothing… I, I, I, can't get hired anywhere with the way this was handled. [Pause] I'm calling my lawyer. I can't agree to this.

**Melissa Esqueda**: So let me just go through the rest of it with you so you'll have that information.

**Rob Penders**: No, I need my lawyer. This is not happening. I'm not agreeing to any of this. I'm not –

**Melissa Esqueda**: Do you want the rest of the information?

**Rob Penders**: Well, I want the information, but I want my lawyer to be present, because this is wrongful termination.

SEU argues that Penders's complaints to Esqueda that his termination was wrongful is not sufficient protected activity because he does not reference any unlawful employment practice such as discrimination on account of his race, and is instead vague at best.  (Dkt. # 70 at 8.)  SEU contends then that Penders did not engage in protected activity because his grievance did not oppose or protest racial discrimination.  (Id.)

The Fifth Circuit has stated that a "vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity."  Davis v. Dallas Indep. Sch. Dist., 448 F. App'x 485, 493 (5th Cir. 2011) (per curiam); see also Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 349 (5th Cir. 2007) (A communication that "contains no reference to conduct that could even plausibly be considered discriminatory in nature" does not give rise to a protected activity.).  However, "[m]agic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue."  Brown v. United Parcel Serv., Inc., 406 F. App'x 837, 840 (5th Cir. 2010) (per curiam).

The Court finds that Plaintiff has presented sufficient evidence to create a fact dispute as to whether his complaints in the meeting that he felt he was being wrongfully terminated put SEU on notice that he was complaining of race discrimination.  The context in which the meeting occurred—amidst race protests

on campus, SEU's investigation into both Palmer's and Thornton's race

discrimination complaints about Penders, in addition to Esqueda's statement in the

meeting regarding President Fuentes and Plaintiff's evidence that Fuentes and the

SEU community were concerned about the "serious [race discrimination]

allegations against a white male coach" (Dkt. # 71-2 at 47; Dkt. # 71-10 at 39–

41)—give rise to factual questions for which a jury could decide Penders was in

fact complaining that he felt he was being wrongfully terminated on account of his

race.  Accordingly, the Court finds that there is a fact issue for trial on whether

Plaintiff engaged in a protected activity.

b.   <u>Causal Connection</u>

SEU contends that even if Penders could offer evidence that he

engaged in a protected activity, he cannot show evidence that there is a causal

connection between the protected activity and his termination.  (Dkt. # 70 at 8.)

The adverse action Penders complains of in his retaliation claim is that he was

terminated immediately instead of the six months more—or after the 2022 baseball

season—he was originally promised.  (Dkt. # 29 ¶134–35.)  An employee may

satisfy the causal connection element by showing "close timing between [the]

protected activity and an adverse action against [him]."  <u>Feist v. La. Dep't of

Justice, Office of the Attorney Gen.</u>, 730 F.3d 450, 454 (5th Cir. 2013) (brackets,

internal quotation mark, and citation omitted). "Such temporal proximity must

generally be 'very close.'" Id. (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001)).

The very close time lapse—within only a few hours—between Plaintiff's complaint about his wrongful termination and SEU's decision to accelerate his termination date from June 2022, to December 2021, is sufficient to establish the requisite causal connection for purposes of Plaintiff's prima facie case of retaliation. See Outley v. Luke & Assocs., Inc., 840 F.3d 212, 219 (5th Cir. 2016); Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 385 (5th Cir. 2003) ("At the prima facie stage, the standard for satisfying the causation element is much less stringent than a 'but for' causation standard." (internal quotation marks and citation omitted)). Accordingly, the Court finds that Plaintiff has created a genuine issue of material fact as to the causal connection between his accelerated and immediate termination—as opposed to six months later—and his complaint that he was being wrongfully terminated.

Having found that Plaintiff has created a fact issue sufficient to survive summary judgment regarding a prima facie case of retaliation, the Court will next consider SEU's proffered legitimate, nonretaliatory reason for Plaintiff's immediate termination.

2.    Reason for Immediate Termination

SEU contends that the decision to immediately terminate Penders after the December 2021 meeting instead of the original June 2022 date is because during the meeting Penders "became angry, leaned over the table, and pointed his finger across the table in the room."  (Dkt. # 70 at 9; Dkt. # 70-4 at 74–75; Dkt. # 70-1 at 18; Dkt. # 70-8 at 5.)  According to SEU's evidence, "[i]n response to Penders hostility, Esqueda notified campus police and an officer came to the room in which [they] were meeting."  (Dkt. # 70-8 at 5.)  And, "[a]fter witnessing Penders' unprofessional behavior in the December 2 meeting, [SEU] was convinced that he could not be allowed to continue to coach and that his termination should be effective immediately."  (Id.)  Because SEU has offered a legitimate, nonretaliatory reason for Plaintiff's immediate termination, the Court will consider whether Plaintiff can show pretext.

3.    Pretext

Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action.  See, e.g., Garcia v. Prof'l Cont. Servs., Inc., 938 F.3d 236, 244 (5th Cir. 2019); Wheat v. Fla. Par. Juv. Just. Comm'n, 811 F.3d 702, 710–11 (5th Cir. 2016).  A plaintiff must show "a 'conflict in substantial evidence'" on the question of whether the employer would not have taken the adverse employment action but

for the protected activity.  Musser v. Paul Quinn Coll., 944 F.3d 557, 561 (5th Cir.

2019) (quoting Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 658 (5th Cir.

2012)).  "Evidence is substantial if it is of such quality and weight that reasonable

and fair-minded men in the exercise of impartial judgment might reach different

conclusions."  Id. at 561–62 (internal quotation marks and citation omitted).

      To show pretext, Plaintiff first offers close timing between his

complaints of wrongful termination and SEU's decision to immediately terminate

his employment.  The temporal proximity between Plaintiff's complaint in the

December 2021 meeting about his wrongful termination and the decision by SEU

to terminate Penders effective immediately is relevant to, but not alone sufficient to

demonstrate, pretext.  See Strong v. Univ. Healthcare Sys., L.L.C., 482 F.3d 802,

808 (5th Cir. 2007).  Therefore, the Court must consider whether Plaintiff's other

evidence, in combination with this temporal proximity, is sufficient for a

reasonable jury to find but-for causation.

      Plaintiff disputes SEU's evidence of his conduct in the December

2021 meeting.  (Dkt. # 71 at 14.)  According to Plaintiff, he did not point his finger

at anyone, did not threaten anyone, and SEU's argument that he had to be escorted

out of the meeting by police is false.  (Id.)  Instead, Plaintiff offers Esqueda's

deposition testimony that: (1) Penders did not raise his voice at the meeting;

(2) Penders did not violate any rule in the employee handbook; (3) she asks the campus police to be available nearby in every separation meeting; and (4) she was worried Penders was going to go back the gym where other coaches and students were located and so she asked the police to escort him off campus "to keep everyone . . . from being interrupted, or keep him from interrupting any meetings or trying to collaborate with any students while he was on campus, and the police officer stood up and asked Mr. Penders to follow him, and he did." (Dkt. # 70-3 at 11–12.) Plaintiff contends this evidence demonstrates pretext by showing that the police were only called in to escort Penders off campus to keep him from talking about the fact that he felt he had been wrongfully terminated and not out of any safety concern. (Dkt. # 71 at 14.)

Given Plaintiff's evidence disputing his and SEU's actions in the December 2, 2021 meeting, the Court finds that a reasonable jury could find that Penders complaints that he was being wrongfully terminated—if a jury finds Plaintiff engaged in protected activity—were the but-for cause of SEU's decision to terminate him immediately instead of the original decision to terminate him in June 2022. Accordingly, the Court finds there is a "conflict in substantial evidence" from which "reasonable and fair-minded [persons] in the exercise of impartial judgment" could disagree as to whether SEU would have immediately terminated Penders' employment "but for the protected activity." See Brown, 969

38

F.3d at 577.  Therefore, summary judgment is denied as to Plaintiff's retaliation

claim.

## II.  Defamation

      SEU moves for summary judgment on Plaintiff's claims for

defamation.  (Dkt. # 70 at 10.)  Plaintiff alleges defamation claims against SEU for

"publishing libelous and slanderous statements about Penders throughout 2021 by

falsely and maliciously conveying the message that Rob Penders had discriminated

against Jacques Palmer and Dom Thornton and that Rob Penders engaged in acts

of racism and bias."  (Dkt. # 29 at 47.)  As discussed below, Plaintiff bases his

claims on: (1) SEU's October 5, 2021 email issued to the SEU community; (2)

SEU's October 12, 2021 school newspaper article; (3) an October 14, 2021 SEU

Student Government Association statement; (4) an October 20, 2021 speech co-

written by SEU Administration and read at a rally; and (5) a December 3, 2021

public statement issued by SEU announcing Plaintiff's termination.  (Dkt. # 14–

16.)

      Under Texas law, "[d]efamation is a false statement about a person,

published to a third party, without legal excuse, which damages the person's

reputation."  Fiber Sys. Int'l, Inc. v. Roehrs, 470 F.3d 1150, 1161 (5th Cir. 2006)

(quoting Moore v. Waldrop, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no

pet.)).  Defamation can be oral or written—that is, slander or libel.  Randall's Food

Mkts., Inc. v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995); see Tex. Civ. Prac. & Rem. Code § 73.001.  To establish a prima facie case of defamation, a plaintiff must show: "(1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages (unless the statement constitutes defamation per se).  In re Lipsky, 460 S.W.3d 579, 593 (Tex. 2015); WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998).  At the outset, the Court notes that the parties do not dispute that Plaintiff is a private citizen, and therefore, he only need show that any allegedly defamatory statements were made negligently, not with actual malice.  See WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998) ("Private plaintiffs must prove that the defendant was at least negligent.").

In a defamation case, the threshold question is whether the words used "are reasonably capable of a defamatory meaning."  Musser v. Smith Protective Servs., Inc., 723 S.W.2d 653, 655 (Tex. 1987).  In answering this question, the "inquiry is objective, not subjective."  New Times, Inc. v. Isaacks, 146 S.W.3d 144, 157 (Tex. 2004).  "But if the court determines the language is ambiguous, the jury should determine the statement's meaning."  Tatum, 554 S.W. 3d at 624.  If a statement is not verifiable as false, it is not defamatory.  Neely v. Wilson,

418 S.W.3d 52, 62 (Tex. 2013) (citing <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S.

1, 21–22 (1990)).  Likewise, "even when a statement is verifiable as false, it does

not give rise to liability if the "entire context in which it was made" discloses that

it is merely an opinion masquerading as a fact."  <u>Tatum</u>, 554 S.W. 3d at 624 (citing

<u>Bentley v. Bunton</u>, 94 S.W.3d 561, 581 (Tex. 2002)).

  In moving for summary judgment, SEU argues that Plaintiff's

defamation claims fail as a matter of law because: (1) no reasonable reader would

understand the implicit defamatory message alleged by Penders; (2) the substantial

truth doctrine bars Plaintiff's claims; (3) the defamatory message alleged by

Penders is not actionable as a matter of law; and (4) Penders cannot offer evidence

that SEU's statements (as opposed to the statements of non-parties) caused him

injury.  (Dkt. # 70 at 11.)  SEU further contends that specific statements made by

SEU are not actionable for defamation because they were not made to third parties.

(<u>Id.</u>)  Finally, SEU maintains that the Court should find that the statements at issue

are not defamatory per se and that each statement is a matter of public concern.

(<u>Id.</u>)

  A. <u>Extrinsic Defamation</u>

  As an initial matter, SEU contends that Penders has not alleged

extrinsic defamation in his pleadings and therefore must rely only on whether the

text of the statements he complains of are capable of defamatory meanings.  (Dkt.

# 70 at 12.)  The Texas Supreme Court has characterized a statement whose text is defamatory without reference to any extrinsic evidence and explanatory circumstances as "textual defamation."  Tatum, 554 S.W.3d at 626.  Textual defamation may be either explicit or implicit.  Id.  On the other hand, "extrinsic defamation" refers to defamation that does require reference to extrinsic circumstances to take on a defamatory meaning.  Id.  Extrinsic defamation occurs when a statement whose textual meaning is innocent becomes defamatory when considered in light of "other facts and circumstances sufficiently expressed before" or otherwise known to the reader.  Id.  An extrinsically defamatory statement requires extrinsic evidence to be defamatory at all, and plaintiffs relying on extrinsic defamation must assert as much in their petitions to present the theory at trial.  Id.

Upon review, the Court finds that Plaintiff has properly pled an extrinsic defamation theory of liability in his complaint to survive dismissal on this basis.  Among others, Plaintiff alleges that: (1) "President Fuentes's October 5, 2021 email to the campus community [constituted defamation, and] was a direct response to and was intended to be understood and in fact was understood by the campus community to be in reference to accusations of [race discrimination by] Jacques Palmer published the day before" (Dkt. # 29 at 47), and (2) "[a]ll future Defamatory Statements were in clear and obvious reference to Penders and the

allegations of discrimination against him.  The St. Edward's community and the news media understood the statements to be about Penders as described in detail in [] above" (Id. at 48).  These allegations are sufficient to constitute claims of extrinsic defamation.

> B.    Implication by Gist

Plaintiff also pleads implication by gist.  "'Gist' refers to a publication or broadcast's main theme, central idea, thesis, or essence," and publications thus generally have a singular gist." Tatum, at 629.  But "implication . . . may emerge from a publication or broadcast's discrete parts" and "includes necessary and logical entailments as well as meanings that are merely suggested." Id.  It "refers to . . . inferential, illative, suggestive, or deductive meanings." Id.

Defamation by implication covers both gist and implication.  Id. To determine defamation by implication, the court must "determine whether the implication the plaintiff alleges is among the implications that the objectively reasonable reader would draw."  Id. at 631.  The court must "not place 'overwhelming emphasis on a[ny] single term' or 'focus on individual statements' to the exclusion of the entire publication."  Id. at 631.  It must "consider[] inferential meaning carefully, but not exhaustively."  Id.  No jury is needed if the

court determines that a statement either can only be construed as defamatory or that the statement is not reasonably capable of defamatory meaning.  Id. at 631. If, however, the court finds the statement is capable of at least one defamatory meaning and at least one non-defamatory meaning, a jury must determine whether the defamatory meaning was conveyed.  Id.

Plaintiff asserts that SEU's statements in its October 5, 2021 email that it had "taken action" against Penders and imposed "consequences" for behavior that was "not alignment with its values," are all textbook examples of defamation by implication.  (Dkt. # 71 at 19.)  Plaintiff argues that the key fact— that Penders was exonerated of race discrimination by SEU's own investigator— was omitted.  (Id.)  On these allegations, the Court finds that Plaintiff has also properly pled implication by gist.

C.     Defamatory Meaning

In conducting the inquiry into whether SEU's words are "reasonably capable of a defamatory meaning," which is a question of law, the Court must construe the statement "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive" the entire statement, not merely the publication's individual statements considered in isolation.  Turner v. KTRK Television, Inc., 38 S.W.3d 103, 114 (Tex. 2000); see also City of Keller v. Wilson, 168 S.W.3d 802, 811 (Tex. 2005)

("[P]ublications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself."). A "person of ordinary intelligence" is one who "exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications." New Times, Inc. v. Isaacks, 146 S.W.3d 144, 157 (Tex. 2004) (noting that this "inquiry is objective, not subjective").

There are two steps in considering whether the words used are reasonably capable of a defamatory meaning: the first is whether Plaintiff's alleged meaning is reasonably capable of arising from the statement and, if so, the Court must then determine if the meaning is reasonably capable of defaming Plaintiff. Tatum, 554 S.W.3d at 625. The Texas Supreme Court has noted the importance of assessing a publication's gist in evaluating a defamation claim. See, e.g., D Mag. Partners, L.P. v. Rosenthal, 529 S.W.3d 429, 434 (Tex. 2017) (citing Neely, 418 S.W.3d at 63–64). A publication "with specific statements that err in the details but that correctly convey the gist of a story is substantially true." Neely, 418 S.W.3d at 63-64 (citing Turner, 38 S.W.3d at 115). Conversely, even if all the publication's individual statements are literally true, the publication "can convey a false or defamatory meaning by omitting or juxtaposing facts." Id. at 64 (quoting Turner, 38 S.W.3d at 114).

According to Plaintiff, his defamation claim is based on a series of statements that SEU made, each of which are intrinsically defamatory and defamatory by nature of extrinsic evidence to which they refer. (Dkt. # 71 at 14.) Plaintiff offers the following statements made by SEU that he contends constitutes defamation. First, Plaintiff offers SEU's email to the SEU community on October 5, 2021, after Palmer's online petition posted the day before, in which Palmer claimed that Penders used the "N word" in front of players, told Black players to remove their head coverings, told Black players about his family's racist history, was insensitive to Black people, and states that Penders had been found guilty of race discrimination and should be terminated. (Dkt. # 70-1 at 19.) After the online petition was posted, SEU issued an email to the school community the next day which stated among others, that "[a] recent and confidential athletics personnel matter necessitated a thorough and comprehensive investigation conducted by an independent firm," and "[f]ollowing the investigation, the university has taken actions, and there have been consequences which are consistent with the university's mission and policies." (Dkt. # 71-10 at 5.) Plaintiff contends this email, made without any context, infers that the allegations made by Palmer in the petition were true. (Dkt. # 71 at 15.)

Second, Plaintiff includes evidence of an October 12, 2021 SEU school newspaper article which Plaintiff asserts led much of the student body to conclude that he had been found guilty of racism and discrimination following SEU's October 5 email.  (Dkt. # 71-10 at 62.)

Third, Plaintiff provides evidence of an October 14, 2021 statement by the SEU Student Government Association which SEU administrators helped draft, that states "[w]e do not condone racism."  (Dkt. # 71-10 at 17.)  Plaintiff contends this statement is in clear reference to him as the first line in the statement discusses Palmer's petition.  (Id.)

Fourth, Plaintiff includes a copy of an October 20, 2021 speech co-written by SEU administration which was read at a student rally.  (Dkt. # 71-15 at 12; Dkt. # 71-10 at 22.)  The speech includes a statement that "[i]in light of what was shared on the [Palmer] petition, it is incredibly disappointing and concerning that a student experienced racism and anti-blackness on our campus," and that "[t]he way the university has handled this situation of bias and racism has been incredibly frustrating."  (Dkt. # 71-10 at 22.)  Plaintiff argues this evidence demonstrates that the SEU community and the public believed Penders was guilty of discrimination and that SEU knew that its communications had led the public to that conclusion, but that it was not true and SEU knew that but still conveyed that message to the public.  (Dkt. # 71 at 15.)

Finally, Plaintiff cites evidence that on December 3, 2021, SEU issued a public statement announcing Penders's termination which referenced SEU's prior statements regarding Palmer's petition, and referred to "new concerning information and allegations . . . regarding the head baseball coach that are not in alignment with our values," and which Plaintiff argues clearly communicated to the public that he had been fired because he was found guilty of discrimination. (Dkt. # 71 at 16; Dkt. # 71-10 at 2.)  As additional support for his claims, Plaintiff includes a December 16, 2021 KVUE, the Austin ABC television affiliate station, story which reports that Penders was terminated "over allegations of racism and discrimination."  (Dkt. # 71 at 16; Plaintiff's Exhibit L.)  Plaintiff contends that "the public predictability concluded what KVUE reported based on SEU's statements: that Penders was in fact guilty of discrimination."  (Dkt. # 71 at 16.)

Given these allegations and the evidence in support, the Court finds that Plaintiff's assertions can be objectively and reasonably understood as stating the meaning that he proposes—that SEU found Penders discriminated against black baseball players and was terminated because of that reason.  Even if some of SEU's statements in isolation may not be actionable, viewing the posts in their entirety, the gist of the statements in—(1) SEU's October 5 email published only one day after Palmer's petition was posted online; (2) SEU's Student Government's statement on October 14, which Plaintiff provides evidence was in

48

part drafted by SEU's administration; (3) the October 12 SEU newspaper article;

(4) the October 14 SEU Student Government statement; (4) the October 20 speech

co-written by SEU administrators; and (5) the December 3 public statement—is

that Plaintiff was guilty of each of the things that Palmer accused him of in his

petition, including race discrimination. See, e.g., In re Lipsky, 460 S.W.3d at 594

(analyzing gist of publications as whole). Under the first step of the gist inquiry,

the Court concludes that the alleged meaning that Penders was found guilty of race

discrimination by SEU is reasonably capable of arising from the text of which

Plaintiff complains. See Tatum, 554 S.W.3d at 625; see also, e.g., D Mag.

Partners, 529 S.W.3d at 437–41 (first analyzing article's gist, then discussing

whether gist was defamatory).

   In the second step of the gist inquiry, to determine whether the

meaning is reasonably capable of defaming Plaintiff, the Court considers whether

the statements are actionable defamatory statements. To be actionable, a statement

must assert an objectively verifiable fact. Milkovich v. Lorain J. Co., 497 U.S. 1,

19 (1990) (explaining that "a statement on matters of public concern must be

provable as false," at least when media defendant is involved, but noting question

is unresolved in cases involving nonmedia defendants); Bentley v. Bunton,

94 S.W.3d 561, 580 (Tex. 2002). For purposes of this analysis, the Court will

assume without deciding that Plaintiff, as a private plaintiff suing private non-

media defendants, must establish that the defamatory statements are objectively
verifiable statements of fact.  Expressing a defamatory statement in the form of an
"opinion" does not necessarily shield the statement from tort liability because an
opinion may expressly or impliedly assert facts that can be objectively verified.
Backes v. Misko, 486 S.W.3d 7, 24 (Tex. App.—Dallas 2015, pet. denied) (citing
Avila v. Larrea, 394 S.W.3d 646, 658 (Tex. App.—Dallas 2012, pet. denied)).  A
court should focus the analysis on the verifiability of the statement and the entire
context in which the statement is made.  Bentley, 94 S.W.3d at 581.  Whether a
statement is an actionable statement of fact, or a constitutionally protected opinion
is a question of law.  Id. at 580.

       The Court finds that some of the statements that contribute to the
defamatory gist of SEU's text are verifiable statements of fact.  For instance,
SEU's statements in the October 5 email that it had "taken action" against Penders,
and imposed "consequences" for behavior that was "not in alignment with its
values" are verifiable statements of fact.  Additionally, although SEU argues that
any statements that allegedly conveyed the message that Penders "engaged in acts
of racism and bias" are not actionable because they are expressions of opinion that
cannot be proven as verifiably true or false, the Court disagrees.  The Court must
consider this "legal question from the perspective of a reasonable person's
perception of the entirety of the communication, not from isolated statements."

Lilith Fund for Reprod. Equity v. Dickson, 662 S.W.3d 355, 363 (Tex. 2023).  As

discussed, Plaintiff has presented additional evidence to support his allegations that

SEU conveyed the message that he had done each of the things that Palmer

accused him of in his online post, including saying the "N word" in front of

players, telling only Black players to remove their head coverings, explaining his

family's racist history, and being insensitive to Black people.  Given this, the Court

finds that—from the perspective of a reasonable person's perception of the

communication—SEU's discrete statements created an actionable impression that

Plaintiff was guilty of racism and bias, and that these statements were not simply a

statement of opinion.  Accordingly, the Court concludes that Plaintiff has

demonstrated that SEU's statements are "reasonably capable of a defamatory

meaning."  Turner, 38 S.W.3d at 114.

   D. Substantial Truth

    SEU contends that even if its statements are reasonably capable of a

defamatory meaning, its statements are true or substantially true and therefore are

not actionable.  (Dkt. # 70 at 15.)  Truth or substantial truth is a complete defense

to a defamation claim.  See Grotti v. Belo Corp., 188 S.W.3d 768, 775 (Tex.

App.—Fort Worth 2006, pet. denied).  "[I]f a broadcast taken as a whole is more

damaging to the plaintiff's reputation than a truthful broadcast would have been,

the broadcast is not substantially true and is actionable."  Neely, 418 S.W.3d at 63

(citing <u>Turner</u>, 38 S.W.3d at 115) ("the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements")).  "Assessing a broadcast's gist is crucial."  <u>Id.</u>  A broadcast with statements that err in the details but that correctly convey the gist of a story is substantially true.  <u>Id.</u> at 63–64.  "On the other hand, a broadcast 'can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory.'"  <u>Id.</u> (quoting <u>Turner</u>, 38 S.W.3d at 114).  Courts determine a broadcast's gist or meaning by examining how a person of ordinary intelligence would view it.  <u>Id.</u>

        In support of its assertion that it made true statements, SEU cites a chart which it contends demonstrates that its true statements match the record evidence in this case.  (Dkt. # 70 at 15–16.)  SEU also argues that its statements were substantially true and that it did not publish other true statements that would have been more damaging to Penders's reputation than the defamatory gist of its statements.  (<u>Id.</u> at 17.)  These statements include that: (1) the investigator found that Penders read the term "nigga" out loud in front of baseball players, some of whom were African American; (2) the investigator found that Penders exhibited cultural insensitivity when he told baseball players, some of whom were African American that he had a history of racism in his family and that he said African

American players only wore du-rags or other hair coverings because they saw athletes wear them on television rather than to protect their hair; and (3) SEU concluded that Penders treated Thornton in a disrespectful, belittling, and disparaging manner during the February 2018 meeting. (Id.; Dkt. # 70-15.)

SEU also includes as evidence statements of potential employers of Penders after he was terminated who ultimately declined to hire him after SEU terminated him. (Dkt. # 70 at 17–18.) SEU cites portions of these individuals' depositions which stand for the proposition that had SEU included the above statements, they would not have hired Penders. (Dkt. # 70-24 at 10; Dkt. # 71-40 at 11–12.)

Plaintiff, however, disputes these facts and argues that SEU's claims that it published the truth is inaccurate because the statements omit other key facts. (Dkt. # 71 at 20.) For instance, Plaintiff cites evidence that he did not use the word "nigga" in front of baseball players and that others were present in the room when it was allegedly said and do not recall hearing it. (Dkt. # 71-6 at 6; Dkt. # 71-12 at 6.) Plaintiff also cites evidence that he was not culturally insensitive when discussing on a zoom meeting with the baseball team—which Palmer did not even attend—his family's past racial insensitiveness after SEU had encouraged its coaches to be open with their teams about racial injustice in light of the May 2020 murder of George Floyd. (Dkt. # 71-12 at 10; Dkt. # 71-7 at 4–5.) Plaintiff further

cites SEU's letters to both Penders and Palmer subsequent to the internal investigation, and which do not conclude that Penders was racially insensitive. (Dkt. # 70-3 at 83–88.)

Plaintiff further maintains that SEU has not met its burden with the substantial truth defense because the additional "facts" it relies on, even if they are true, are not the "substantial truth" because they omit other key facts, including that: (1) SEU's own investigator concluded that Penders did not act in a discriminatory manner or violate a university policy in regard to either Palmer or Thornton; and (2) SEU agreed with these findings. (Dkt. # 71 at 20.) Plaintiff also argues that SEU's unpublished statements discussed above are not more damaging to Penders than the published statements, especially where they only tell half of the story. (Id. at 21.)

The Court agrees with Plaintiff. Given the disputing evidence presented by the parties, the Court finds that SEU has not established as a matter of law that the gists of its statements upon which Plaintiff complains is substantially true and not more damaging than the absolute truth would be, especially where Plaintiff has presented competing evidence that SEU omitted other key facts. Instead, the Court finds a dispute of fact exists on this issue.

E.    <u>Whether SEU's Statements Proximately Caused Damages</u>

SEU further argues that Plaintiff has failed to offer sufficient evidence that its alleged defamatory statements proximately caused his damages.  (Dkt. # 70 at 18.)  SEU contends that Plaintiff fails to establish that any alleged damages were directly caused by SEU's statements as opposed to those statements made by Palmer or others.  (<u>Id.</u> at 19.)  SEU asserts that "Penders cannot bootstrap damages he suffered as a consequence of Palmer's statements and actions (all of which were made before SEU's statements) onto SEU."  (<u>Id.</u>)  SEU furthers maintains that Plaintiff fails to offer evidence that SEU's statements caused him specific harm and that summary judgment should therefore be granted on Plaintiff's defamation claims.  (<u>Id.</u>)

Again, the Court finds a fact issue exists as to whether SEU's statements were the cause of any of Plaintiff's alleged damages.  SEU has presented evidence that any alleged damages were a proximate result of Palmer's online petition and viral social media video posted to Tik-Tok.  (Dkt. # 29-1.)  On the other hand, Plaintiff has presented his own evidence that SEU's official statements after Palmer's petition and video, and in which omitted key facts that Penders was in fact cleared of race discrimination in an independent investigation, conveyed a different meaning to the general public, including to future potential employers who considered SEU's statements in making a hiring decision.

Therefore, the Court finds that a fact issue exists for a jury to determine whether it was Palmer's statements or SEU's statements that proximately caused Plaintiff's alleged damages by his inability to find other employment after his termination.

      F.    Defamation Per Se

SEU also argues that Plaintiff has not alleged defamation per se because "[t]he specific trait of not engaging in racist acts . . . is not peculiar or unique to being a baseball coach."  (Dkt. # 70 at 23–25.)  The Court disagrees.  "Texas recognizes the common-law rule that defamation is either per se or per quod."  Dallas Morning News, Inc. v. Tatum, 554 S.W.3d 614, 624 (Tex. 2018) (citing Lipsky, 460 S.W.3d at 596).  "Defamation per se occurs when a statement is so obviously detrimental to one's good name that a jury may presume general damages, such as for loss of reputation or for mental anguish."  Id. (citing Hancock v. Variyam, 400 S.W.3d 59, 63–64 (Tex. 2013).  "Statements that injure a person in [his] office, profession, or occupation are typically classified as defamatory per se."  Id.  "Defamation per quod is simply defamation that is not actionable per se."  Id. (citing Lipsky, 460 S.W.3d at 596).

The Texas Supreme Court has determined that "'[d]isparagement of a general character, equally discreditable to all persons, is not enough unless the particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession.'"  Bedford v. Spassoff, 520 S.W.3d 901, 905

(Tex. 2017) (quoting Restatement (Second) of Torts § 573 cmt. E).  Here, the

Court finds statements that portray a baseball coach has engaged in racism or

discrimination go directly to one's professional ability to lead, manage, and relate

to and connect with players, including minority players on a team.  Plaintiff has

presented evidence that employers hiring baseball coaches consider these qualities

in the decision-making process.  (Dkt. # 70-24 at 16–17.)  Therefore, the Court

finds that a character trait that someone is not racist, insensitive, or bias is

"peculiarly valuable" in Plaintiff's profession as a baseball coach.  See Bedford,

520 S.W.3d at 905.  The Court thus concludes that, contrary to SEU's arguments,

Plaintiff has adequately alleged defamation per se in this case.

      G.   Public Concern

      SEU argues that any alleged defamatory statements implicate matters

of public concern.  (Dkt. # 70 at 25.)  SEU argues the Court should find that any

alleged defamatory statement is a matter of public concern, but fails to provide the

Court with any context for this finding, or explain how it bears on the relief it seeks

in this motion.  To the extent SEU argues that any alleged defamatory statements

must be proven false because they are matters of public concern, the Court has

already considered this above.  See Milkovich v. Lorain J. Co., 497 U.S. 1, 19

(1990) (explaining that "a statement on matters of public concern must be provable

as false," at least when media defendant is involved, but noting question is

unresolved in cases involving nonmedia defendants).

    E.   <u>Conclusion</u>

Because the Court finds that there are genuine disputes of material

fact as to Plaintiff's defamation claims based on SEU's statements above, the

Court will deny summary judgment.  As discussed, the Court finds that portions of

SEU's statements are capable of a defamatory meaning and, because the

statements tend to injure Plaintiff's business and profession, constitute defamation

per se; the Court will appropriately leave the ultimate determination of whether

such statements are in fact defamatory for the jury.

III.   <u>Objections to Evidence</u>

SEU filed objections to the summary judgment declaration of

Plaintiff.  (Dkt. # 74.)  Because the Court did not rely on Plaintiff's declaration in

deciding the motion for summary judgment, the Court will overrule SEU's

objections to that declaration.

<u>CONCLUSION</u>

Based on the foregoing, the Court will **GRANT IN PART** and

**DENY IN PART** SEU's Motion for Summary Judgment.  (Dkt. # 15.)  The

motion is **GRANTED** as to Plaintiff's 42 U.S.C. § 1981 race discrimination claim

and that claim is **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** as

58

to Plaintiff's 42 U.S.C. § 1981 race retaliation claim and his claims for Texas

common law libel and slander.  Trial in this case will be set by separate order.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, March 18, 2024.

_____

David Alan Ezra
Senior United States District Judge